which IBM responded that after checking multiple databases, they were unable to locate any record of any dealings with POWERS and/or COMMUNICLIQUE.

18.     During a recorded call between POWERS and an investor, POWERS stated that The Nerdery was one of COMMUNICLIQUE's largest channel partners. A subpoena was issued to The Nerdy, to which The Nerdery responded "…the Nerdery does not sell CommuniClique's digital technology tool, product, and/or service. Nor does Nerdery have any invoices, purchase orders, payments, fees, investments, contracts, or other requested documents relating to CommuniClique."

### III.     Financial Analysis

19.     A review of bank records between January 2011 and December 2018 associated with the COMMUNICLIQUE Bank of America accounts receiving funds from investors, including the investors referenced in this affidavit, revealed there is no source of revenue from any of the companies proclaimed to be customers of COMMUNICLIQUE, nor are there any financial transactions between COMMUNICLIQUE and IBM or The Nerdery.

20.     A review of bank records between October 2018[3] and December 2018 associated with the CLIQUE COMMUNICATIONS Wells Fargo bank account receiving funds from investors, including at least one investor referenced in this affidavit, revealed there is no source of revenue from any of the companies proclaimed to be customers of COMMUNICLIQUE, nor are there any financial transactions between CLIQUE COMMUNICATIONS and IBM or The Nerdery.

21.     During the interview with the FBI, POWERS was asked to identify the bank accounts where COMMUNICLIQUE was receiving revenue. POWERS told me that he did not

---

[3] This account was not open until October 2018.

want to provide this information because it would hurt his banking relationships. My investigation

has revealed no other bank accounts where COMMUNICLIQUE would have been receiving

revenue.

**IV.    Investors**

### Investor J.C.

22.    Investor J.C. resides in EDVA. J.C. was interviewed by the FBI and provided the

following information: J.C. learned about COMMUNICLIQUE through P.R., who was a Chairman

for COMMUNICLIQUE. J.C. received an email from P.R. in May 2015, which stated that

COMMUNICLIQUE should have a valuation of around $450 million as of the date of the email

and should have a valuation of $700 million by the end of that year. The email to J.C., which

POWERS was copied on, stated that COMMUNICLIQUE was looking to raise $1 to $2 million.

J.C. did not invest at that time, but on June 23, 2016, P.R. sent J.C. another email that stated, in

part:

"Communiclique has done $71.5 million in revenue in 2015 and expected to do $130 million
this year…"

23.    Then on July 13, 2016, P.R. sent J.C. an email, coping POWERS, inviting J.C. to

attend a COMMUNICLIQUE meeting in Chantilly, Virginia on July 23, 2016, which J.C., along

with other investors, attended. J.C. recalled POWERS presenting about COMMUNICLIQUE at

this meeting. During the meeting, POWERS told J.C. that the fundraising round was closed, but

three days after the presentation, POWERS called J.C. and told him that he had some shares that

had opened up at $5.76 per share, although they were actually worth more. POWERS then

followed up with an email to J.C. on July 26, 2016, stating the following, in part,

"I wanted to follow up from our conversation to tell you that very confidentially I have
100,000 shares leftover from our last round that we closed (all but this small amount) last
year at $5.76/ share…"

24.     Attached to this email was a document titled

"CommuniClique_Exec_Summary_0901_ExecutiveSummary_2_1_(2)," which was a one-page

document showing 2015 revenue of $72 million and 2016 projected revenue to be $120 million.

The executive summary also stated "High volume communications companies such as Federal

Express, The Hartford, Uber, and Airbnb use CommuniClique to connect millions of minutes per

day of calls."

25.     Based on the information he had been told and the information he was provided in

writing, J.C. invested $115,200 on August 8, 2016. The funds were wired from J.C.'s SunTrust

bank account to COMMUNICLIQUE's Bank of America account ending in 2198.

26.     P.R. was interviewed by the FBI and advised that all of the information he passed

along to investors came directly from POWERS.

### Investor W.J.

27.     W.J. resides in EDVA. W.J. was interviewed by the FBI and provided the following

information: In or around September 2016, W.J. learned about COMMUNICLIQUE through a

mutual associate he shared with POWERS. W.J. was told by his associate that

COMMUNICLIQUE had the following revenues: $45 million in 2014, $75 million in 2015, and

$123 million projected for 2016. Around October 2016, COMMUNICLIQUE began renting office

space in the same building that W.J. worked out of, so W.J. began hearing more about

COMMUNICLIQUE directly from POWERS. In particular, W.J. learned that FedEx was

purportedly a big customer of COMMUNICLIQUE.

28.     A review of emails and records provided by W.J. showed that on December 3, 2016,

W.J. received an email from T.G., who was the President and Chief Operating Officer for

COMMUNICLIQUE, which contained an attachment titled

"CommuniClique_Exec_Summary_2016." The attachment referenced COMMUNICLIQUE's

revenue as being the following: $46 million in 2014, $74 million in 2015, $120 million in 2016, as well as projections for 2017 and 2018 being $221 million and $358 million, respectively. On December 8, 2016, T.G. sent W.J. an email with an attached P&L for the time period October 2015 through September 2016, which showed $105,692,459 in revenue, specifically $4,320,000 of that being associated to "Federal Express Product." W.J. told the FBI that seeing the P&L and seeing that the revenue was growing was important in leading to his decision to invest.

29.     T.G. was interviewed by the FBI and advised that all of the information he passed along to investors came directly from POWERS.

30.     A review of bank records showed that on September 6, 2017, W.J., through his company account, wired $100,005.12 to COMMUNICLIQUE's Bank of America account ending in 2198.

**Investor J.G.**

31.     Investor J.G. resides in EDVA and invested approximately $3,000,011 into COMMUNICLIQUE. J.G. was interviewed by the Virginia State Corporation Commission (hereinafter "VSCC") and provided the following information: J.G. was introduced to POWERS by an already existing COMMUNICLIQUE investor whom J.G. knew. After being introduced to POWERS, meeting with him on four separate occasions, and receiving various documents, J.G. decided to invest.

32.     On September 21, 2015, J.G. wired $2,000,000 from his business account at The Bank of New York Mellon to COMMUNICLIQUE's Bank of America account ending in 2198.

33.     A review of emails and documents provided by J.G. show that on February 16, 2016, POWERS sent J.G. an email, which had attached to it the 2015 Evergreen Advisor "valuation analysis." J.G. told the VSCC that this was one of the documents he relied upon when making his investment.

11

34.     On February 17, 2016, J.G. wired an additional $1,000,011 to

COMMUNICLIQUE's Bank of America account ending in 2198.

### Investor J.D.

35.     Investor J.D. resides in California and invested approximately $3,622,250.90 in

COMMUNICLIQUE.  J.D. was interviewed by the FBI and provided the following information:

J.D. first learned about COMMUNICLIQUE and POWERS through P.R.  Around the August and

September 2016 timeframe, J.D. began learning more about COMMUNICLIQUE through phone

conversations with POWERS, in which POWERS represented that COMMUNICLIQUE had

revenues over $100 million and customers like FedEx, Wilmer Hale, Uber, and Airbnb.  POWERS

then provided J.D. with COMMUNICLIQUE's 2015 investor letter, which also included the 2015

P&L, as well as an Evergreen Advisors valuation analysis.  POWERS also provided J.D. with a

one-page executive summary, which showed the following revenues: $46 million in 2014, $74

million in 2015, and $120 million in 2016, with revenue projections for 2017 and 2018 of $221

million and $358 million, respectively.  These documents reiterated what POWERS had already

told J.D. verbally.

36.     POWERS introduced J.D. to multiple existing COMMUNICLIQUE investors who

were interested in selling their shares.  Between November 2016 and May 2017, J.D. purchased

approximately $1,462,250.90 worth of COMMUNICLIQUE stock from existing investors.  J.D.

wired the funds separately to each investor, and the transfer of stock was documented through

agreements signed by the existing shareholder, J.D., and POWERS.

37.     On November 29, 2016, J.D. flew from California to Dulles International Airport,

which is in EDVA, to meet with POWERS for the purpose of discussing his upcoming

investments.  J.D. stayed in a hotel in EDVA, which was paid for by POWERS.  J.D. flew back to

California on December 2, 2016.

38.     A review of bank records shows that on December 6, 2016, J.D. wired $1,152,000 in two separate transactions of $852,000 and $300,000 from his Wells Fargo bank account to COMMUNICLIQUE's Bank of America account ending in 2198.

39.     On December 12, 2016, J.D. returned to EDVA to meet with some of the existing investors, from whom he later purchased shares.

40.     On June 23, 2017, J.D. invested an additional $1,008,000 in COMMUNICLIQUE. The funds were wired directly to COMMUNICLIQUE's Bank of America account ending in 2198.

## Investor A.S.

41.     Investor A.S. resides in California.  A.S. was interviewed by the FBI and provided the following information: A.S. learned about COMMUNICLIQUE through T.G., who introduced A.S. to POWERS around May or June 2016.  During the initial meeting between POWERS and A.S., POWERS told A.S. that COMMUNICLIQUE was growing rapidly and was doing over $100 million in revenue with customers like Uber and Airbnb.

42.     Based on the information told to A.S. by POWERS, on June 1, 2016, A.S. invested $500,020 with COMMUNICLIQUE.  A.S. received the stock certificate for this investment by mail on April 4, 2017, which was mailed to A.S. at an address in Maryland from DLA Piper in Reston, Virginia.

43.     On December 6, 2017, A.S. invested an additional $500,000, which was wired to COMMUNICLIQUE's Bank of America account ending in 2198.

44.     On December 29, 2017, POWERS sent A.S. an email, which stated the following, in part:

"Andrew – We really appreciate your assistance earlier this month. I wanted you to know that we'd like to grant you some shares in the form of warrant in exchange for your assist…Also, I'm planning to buy the remaining 332,883 shares from the last round ($106MM Val/ $5.76 per share) today. We set shares aside as employee grants and didn't execute on them fully so the board has offered to sell them to me to purchase to remaining.

I wanted you to know they are available to you as well if you have any interest. We're growing and are overdue a capital raise but I think we'll be happy we waited for the right partners…the valuation is looking to be near $1B."

45.    A.S. replied to this email and stated that he would like to use $500,000 to buy more shares. On January 5, 2018, A.S. wired $500,005.12 to COMMUNICLIQUE's Bank of America account ending in 2198.

46.    On February 19, 2018, POWERS sent A.S. an email, which stated the following, in part:

"…We're building a package to send out to the investors on the convertible note and subsequent round (attached). Would you take a look when you have a chance and send feedback? Would you participate in the round? Also, would you consider purchasing your warrant (see attached) from last month? I'm trying to bridge the gap for the month and it would be very helpful. No obligation here, You've got a 10 year exercise period or 90 days before we IPO[4]…"

47.    Included with the email referenced above, were five attachments, one of which was titled "Clique 2017 P and L." This P&L covered the time period of January through December 2017 and showed $167,606,879 in total income.  Also attached to the email was a document titled "Clique_Teaser_Feb2018," which is a one-page document showing the following revenues: $74 million in 2015, $121 million in 2016, and $165 million in 2017.  The document also states "…current customers include Staples, The Hartford, Wilmer Hale, and FedEx."

48.    On February 27, 2018, POWERS followed up with A.S. by email stating the following, in part:

"…I need $2M to get to 03/26 which is the close of the convertible note. Would you consider a loan that would be first in line that be ahead of my line of credit to the business in the priority stack?...I'd like to offer 100,000 shares plus interest…"

---

[4] Based on the context of this email and my knowledge of the case terminology, I believe "IPO" to mean Initial Public Offering.